LISA REED-JOHNSON,            )
                             )
        Plaintiff,            )
                             )
v.                           )
                             )  No. 3:04-0466
                             )  JUDGE ECHOLS
MONTGOMERY COUNTY, TENNESSEE, )
LIZ CARROLL, in her official )
and individual capacities, and )
LOIS BANKES, in her official )
and individual capacities,   )
                             )
        Defendants.          )

## MEMORANDUM

Presently pending before the Court are Montgomery County's Motion for Summary Judgment (Docket Entry No. 47), the Motion for Summary Judgment of Defendants Carroll and Bankes (Docket Entry No. 49), and Defendant's Objections to Plaintiff's Response (Docket Entry No. 57), to which the parties have responded in opposition.[1] Plaintiff is an African-American who brought suit against Defendants Montgomery County, Liz Carroll and Lois Bankes asserting claims of racial discrimination and racially hostile work environment under Title VII, 42 U.S.C. § 2000e *et seq.*, the Tennessee Human Rights Act ("THRA"), § 4-21-301 *et seq.*, and 42

---

[1]Defendant Montgomery County objects to Plaintiff's late response to its Motion for Summary Judgment. The objection is overruled because the Court granted Plaintiff leave to file her response out of time by Order entered August 10, 2005. (Docket Entry No. 63.)

Case 3:04-cv-00466   Document 82   Filed 08/24/05   Page 1 of 35 PageID #: 672

U.S.C. §§ 1981 & 1983. Plaintiff also appears to assert a claim of retaliation under these statutes, even though the Amended Complaint does not plead such a claim. Plaintiff also asserts an equal protection claim against all three Defendants under the Fourteenth Amendment of the U.S. Constitution.

## I. **FACTS**

Plaintiff was employed as a licensed Certified Nurse Assistant ("CNA") at the Montgomery County Nursing Home from February 7, 2002, until her termination effective October 14, 2003. The nursing home is a licensed facility owned by Montgomery County, and it is a department within county government.

The county contracted with Interim Administrator Consultants, Inc. ("Interim"), to provide on-site management and administration for the nursing home. Defendant Liz Carroll, who is Caucasian, was employed by Interim and reported directly to its President, Dan Stockdale. Carroll served as on-site administrator of the nursing home from November 2002 to November 2003 pursuant to the contract between the county and Interim. She has a bachelor's degree in management and a paralegal certificate, and she is a licensed nursing home administrator who previously managed a 48-bed locked facility for dementia and Alzheimer's patients. Carroll was expected to follow all county employment policies. Her duties included hiring, supervising, disciplining and discharging nursing home employees in consultation with Glenn A. Abee, Director of

2

Administration and Development for the county. Thirty-nine county departments or agencies report to Abee, who is responsible for the human resource issues for the county. Abee is Caucasian.

The county's personnel policy states that all employees serve at will and that the county is an equal opportunity employer that does not make decisions on the basis of race, color, religion, gender, national origin, age or non-job related disability. The policy addresses unlawful harassment in the workplace and includes a procedure for raising complaints of discrimination. Plaintiff signed an acknowledgment for receipt of the employee personnel policy, and she knew the steps for submitting a grievance.

Lois Bankes, who is also Caucasian, was employed at the nursing home as a CNA. She was Plaintiff's co-worker. She did not have any supervisory authority over Plaintiff, nor did she have any policy-making authority for the county.

Plaintiff is forty-five years old and has suffered from a mental disorder involving depression and mood swings since she was twenty-two. She has been hospitalized multiple times for depression and takes medication for her condition. She admits she hears voices that others do not hear, she is paranoid, she is different from others, and she has difficulty with memory. Plaintiff checks her house and will not drive her car because she is afraid. Plaintiff's daughter pays bills for Plaintiff because it is too stressful for her. Despite her medical condition,

3

Plaintiff raised her children and maintained employment. Plaintiff previously worked as a CNA. Plaintiff's prior employers indicated she performed her duties satisfactorily and they gave her favorable employment references.

Plaintiff's duties as a CNA for the county included making scheduled checks of residents, providing care for the residents' basic daily needs, assisting residents getting into or out of bed, placing or moving restraints, assisting with feeding and bathing, answering call lights and responding to residents' needs, observing personal hygiene of the residents, making reports on changes in behavior or health, recording intake and activities of residents, working collaboratively with residents, staff and families, assisting visitors to the appropriate room, acquainting new residents with roommates, changing bed linens, and ensuring cleanliness of rooms. Plaintiff received wage increases while she was employed.

After working at the nursing home for just over one year, Plaintiff was granted leave from her position in February 2003 under the Family and Medical Leave Act ("FMLA") for depression after two of her infant grandchildren died within a period of a few months. Although Plaintiff had worked on third shift from 11 p.m. to 7 a.m., upon her return from FMLA leave on June 1, 2003, she requested and received a transfer to second shift, 3 to 11 p.m. Plaintiff made this request as a result of her medical condition so

4

that she could sleep at night. Her duties did not change. Her supervisors on second shift were Kim Shavers, an African American female who was Assistant Director of Nursing, and Valerie Hines, an African American LPN. Plaintiff testified she was the only African-American on the 3 to 11 p.m. shift, but she informed the Equal Employment Opportunity Commission ("EEOC") in a Charge Information Form both that she was "the only Black CNA on my shift" and that "Tina and myself . . . were the only black CNA['s] on our shift." (Docket Entry No. 51, Ex. A, Johnson Depo., Ex. 12 at 4.) Her personnel file does not contain any record of grievances from her or about her until after her transfer from third to second shift. During her tenure at the nursing home, Plaintiff was counseled on July 25, 2002, about her attendance, on August 3, 2002 for failure to perform job duties, and on January 6, 2003, for poor conduct on the job.[2]

According to Plaintiff, the nursing home began dealing with racial issues concerning its employees while Plaintiff was on FMLA leave, and Shavers did not tell Plaintiff about this when she returned to duty on second shift. Plaintiff alleges that Caucasian

---

[2]Plaintiff attests that her personnel file does not contain information indicating she had trouble remembering and following through on assigned duties as a CNA. (Docket Entry No. 70, Johnson Aff. at ¶ 8.) Defendant Montgomery County objects to the paragraph on the ground it directly contradicts Plaintiff's own handwritten statements indicating she has a disability involving not remembering or being able to put her words on paper. The two statements are not inconsistent and the objection is overruled.

5

CNAs would offer assistance to other Caucasian CNAs, but not to her.[3]

On July 14, 2003, Plaintiff was assigned to a hall with Bankes and another CNA who, like Plaintiff, was new to the hall. Plaintiff did not know Bankes and had never had any personal conversation with her. Plaintiff observed that Bankes was explaining to the other CNA how to perform work on the hall. Plaintiff followed Bankes and the CNA into a room and asked if Bankes intended to help her. Bankes told Plaintiff she could come in also, but Plaintiff was offended by Bankes' tone of voice and went to the nurse's station to complain. Bankes also walked to the nurse's station where Plaintiff and Bankes exchanged words. Bankes did not say anything racially insulting to Plaintiff or call Plaintiff any racial names. Carroll counseled Bankes for the incident. Carroll and Shavers signed a written disciplinary notice, categorized as a "final written reminder," that was issued to Plaintiff. The notice stated:

> Employee cautioned on resident privacy. Employee discussed personal business in a resident room with a resident present. Employee also is cautioned on not discussing race relations on the floor as it causes conflict and derision. Further incidences of this type

---

[3]Defendant Montgomery County objects to Plaintiff's reliance on a handwritten statement signed by a CNA with the first name of Sandy. The county contends the statement is hearsay of a non-party provided to the EEOC as part of a request for information to the county. The Court agrees the statement is hearsay and will not consider it. The objection is sustained.

will lead to additional counseling up to and including termination.

(Docket Entry No. 68, Ex. 7 at 337.) Plaintiff refused to sign the disciplinary notice. Under the county's personnel policy, a written reprimand is a more severe form of discipline than verbal counseling or reprimand.

Plaintiff filed an administrative charge with the Tennessee Human Rights Commission on July 28, 2003, claiming race and disability discrimination. The charge was forwarded to the EEOC, which was unable to conclude that discrimination had occurred. The EEOC issued a Dismissal and Notice of Rights on February 27, 2004.

At the end of July 2003, Plaintiff reported that she overheard the conversation of two co-workers, Hedi Powell and Betty Clark, who said that "she (Plaintiff) should go back to the third shift with her own kind." Carroll investigated the incident by interviewing Plaintiff and the two co-workers, who denied making the statement. Carroll felt she could not substantiate Plaintiff's allegation. She weighed the credibility of Plaintiff's story, Plaintiff's admission to Carroll that sometimes she mixed things up, the denials of the other employees, and the fact that the employees did not have a prior history of similar behavior. She thought the employees were earnest in their delivery and that Plaintiff was "a little bit fragmented but earnest." (Carroll Depo. at 28.) Powell is married to an African American and reported she had been subjected to racial discrimination as a

7

result.  (Docket Entry No. 68, Ex. 7 at 386.)  Carroll took into account that the two women could have colluded to respond consistently with each other and in conflict with Plaintiff. Because there was no corroboration of Plaintiff's account, Carroll felt she could not issue any discipline.  She met with Clark and Powell, warned them that racism is intolerable in the nursing home, and discussed the concept of a hostile working environment. Plaintiff testified that, after she filed the grievance against Hedi and Betty, they "let it go" and they never said anything else to her.  Plaintiff also complained of racism by co-workers named Mary and Kathy, and Carroll investigated those complaints as well, but the complaints could not be substantiated.

In early August 2003, Bankes and another CNA discussed how to divide up showers for five residents.  Bankes agreed to take three of them if the other CNA would take one and Plaintiff would take one.  Plaintiff became angry when the CNA asked her to take one of the showers.  Bankes approached Plaintiff while she was working in a resident's room and the two exchanged words.

As a result, Carroll recalls that she suspended both Plaintiff and Bankes pending investigation.  Disciplinary records do not confirm that Bankes was suspended.  Carroll reviewed a security videotape, which did not have audio, of the altercation.  Bankes twice put up her hands to Plaintiff, as if to say, "stop."  Carroll described the tape as showing Bankes and Plaintiff coming out of a

8

resident's room talking, Bankes turning and making a hand motion, turning to leave, and then stopping again and making another hand motion. Carroll suspended Plaintiff for seven days, from August 5-12, 2003, with pay. After this incident, Bankes was not on Plaintiff's assigned work team anymore and Plaintiff did not work with Bankes. Plaintiff admitted that Bankes worked with another African American female CNA. Abee denied that the suspension was issued because Plaintiff had filed an EEOC charge.

In conducting investigation, Carroll formulated written questionnaires about the incidents and collected answers from the involved employees. She spent "hours upon hours" investigating Plaintiff's grievances. (Docket Entry No. 51, Ex. B, Carroll Depo. at 50.) She met with Plaintiff and Bankes "on different occasions" about the investigations. (Id.)

Plaintiff's handwritten statement about Bankes does not mention any racial comment, insult, or question from Bankes. Plaintiff testified Bankes told her she was "mean" and "prejudiced." When asked to explain why she thought Bankes was racially biased against her, Plaintiff stated she never spoke with Bankes because Bankes looked angry and she "just threw out there that she didn't like African American people."

On another occasion, Bankes was in the break room talking to a resident's family member, Joe Skowren. He was sunburned from riding a motorcycle. As Plaintiff walked in the room, Skowren

9

commented that he had been out in the sun too long. Plaintiff thought the comment was racially offensive. Carroll investigated Plaintiff's complaint of racism by interviewing Bankes and Skowren. Although Plaintiff thought someone else had been present, she could not remember who, so Carroll could not interview anyone else. Carroll concluded it was a misunderstanding and she could not substantiate Plaintiff's allegation of racism.

Plaintiff called Carroll one evening while she was at dinner and stated Carroll needed to come to the nursing home because "someone had looked at her wrong." (Carroll Depo. at 105.) When Carroll arrived at the nursing home, numerous members of Plaintiff's family were in the lobby. Plaintiff told Carroll it was a misunderstanding and Carroll could leave. Plaintiff told Carroll she had been at the nurse's station, a co-worker looked at her and she felt fearful, and Plaintiff called Carroll to come to the nursing home and resolve it. Carroll waited for Plaintiff's family to leave and then she left also.

Although Plaintiff testified she heard the "n" word used at the nursing home, she did not report use of the word or other threats because she did not know for sure who said them. Plaintiff also testified, however, that she told Kim Shavers in July 2003 that "they" called her the "n" word, made fun of her, and talked about her. Plaintiff did not identify any employee who called her by a racially derogatory name. She further testified that Shavers

10

cried and told her she had suffered discrimination.[4] Plaintiff testified that another CNA, Sandy, saw Bankes making faces at Plaintiff, but Plaintiff said she never looked back to see who was making faces at her.

Carroll talked with Plaintiff about Plaintiff's claims of racism at the nursing home and in Clarksville. Carroll told Plaintiff that her concerns would be taken seriously. The only allegations of racism Carroll investigated concerned Plaintiff. Kim Shavers may have investigated complaints by other employees. Carroll testified that she had not once heard racially derogatory names used at the nursing home, nor had any employee reported use of a racial epithet. Carroll discussed Plaintiff's concerns about racism with Abee and her superior, Stockdale, both of whom took the issue of racism seriously. They told Carroll they wanted the nursing home employees to know that the concerns were taken seriously.

Carroll compiled a written summary of her investigations and submitted it to Abee. Carroll stated in her investigation summary that "emotions ran very high on both sides[,]" that every interviewee "was hurt and tearful at the thought of being

---

[4]Defendant Montgomery County objects to Plaintiff's reliance on a handwritten, unsworn hearsay statement written by Shavers in July 2003 to "respond to the untruthful statements alleged by Tammy Sisk[.]" (Docket Entry No. 68, Ex. 7 at pages 358-364.) The Court agrees the document is hearsay and will not consider it. The objection is sustained.

11

considered racist," and that most of those who were asked to respond to Plaintiff's complaints of racism had in turn filed formal grievances "in response to being named as prejudiced by [Plaintiff]." (Docket Entry No. 68, Ex. 7 at 385.) Carroll reported the only consistent response in her investigations were that "each respondent stated that race had not come up until [Plaintiff] accused each of being prejudiced and all felt that they had been discriminated against by [Plaintiff]." (<u>Id.</u>) She also stated, "I do have great concern that we do have a hostile work environment, but have found no evidence that it is due to race (I hear a lot of folks talking about others being prejudiced, but cannot substantiate any actual racial comments occurring)." (Docket Entry No. 68, Ex. 7 at 386.) She further stated that certain actions, such as eye-rolling, "does create a hostile working environment for [Plaintiff] and it is the facility's obligation to correct this." (<u>Id.</u>) She also stated that "it is clear that [Plaintiff] is working in an environment that is hostile toward her. Unfortunately, it is unclear how much of this climate existed prior to this investigation and how much of it is the result of the investigation." (<u>Id.</u>) Carroll recommended holding a meeting with the second shift to discuss the policy against discrimination in the workplace and the code of conduct for working in the nursing home. She also suggested facility-wide diversity training, an in-service about the policy against discrimination,

12

and appropriate disciplinary actions for employees who contribute to a hostile work environment. Abee could not recall any specific county-wide racial discrimination training in years, but he recalled supervisory training that had been done.

With Abee's approval, Carroll met with all of the nursing home employees at scheduled meetings, told them that the issue of racism was being taken seriously and that management would not support any form of racism at the nursing home. She read the Equal Employment Opportunity policy verbatim, reviewed the policy and process for filing a grievance, and encouraged the employees to file a grievance if they felt they had been discriminated against or were being treated in a hostile manner. A few employees asked questions and Carroll answered them. Plaintiff attended the second shift meeting.

Based on her investigations, Carroll felt that Plaintiff created a hostile work environment because she made numerous allegations based on race that could not be substantiated. Also, employees were afraid of Plaintiff. Kim Shavers, the Assistant Director of Nursing, reported to Carroll that she thought Plaintiff was unstable. Shavers had a conversation with Plaintiff in which Plaintiff talked about postal workers shooting people. From that point on, Shavers took an alternate route home. Shavers, Bankes, Powell, and Clark were all afraid that Plaintiff would bring a gun to work. Carroll also felt that Plaintiff was a danger because as

13

time progressed, she seemed more and more unstable, Plaintiff admitted she mixed things up and Carroll's "assessment of it was that she wasn't a stable individual by her own admission." (Carroll Depo. at 91.) Plaintiff reported to co-workers that she had a dream that Carroll shot her and killed her on C-Hall. Although Carroll was not the nursing home administrator when Plaintiff took FMLA leave in early 2003 for depression, Shavers told Carroll that Plaintiff had taken FMLA leave for mental health reasons. Plaintiff did not make any verbal threats or threatening gestures to Carroll, Bankes or any other employee.

Plaintiff conceded that Carroll and Abee never used any racial slurs or insults, they did not call Plaintiff names, and they did not threaten her. When asked to state what made Plaintiff believe Carroll was racially biased, Plaintiff stated she thought Carroll was biased because of her body language and the way Carroll looked at her. She recalled that Carroll told her stories about making things right for black people and Plaintiff "got tired of hearing them." Plaintiff attests that she learned from Carroll her father had been a member of the Ku Klux Klan and Carroll reminded her that she was in Clarksville, Tennessee, where "Caucasians . . . are very prejudiced and don't like Blacks[,]" (Docket Entry No. 70, Johnson Aff. at ¶ 5), but Plaintiff also testified Carroll said things that let Plaintiff know Carroll did not believe in what the KKK stood

14

for, and that Carroll had an African American friend.[5]  Plaintiff

felt that Abee was fair with her when he met with her, but she

thought he was biased against African Americans because he would be

in a meeting or she would be told she had just missed him when she

went to talk to him.

On September 4, 2003, Plaintiff became upset and called the

police to the nursing home to report a threat Bankes had allegedly

made at an earlier time.  When talking to the police, Plaintiff

could not recall when the threat was made, but claimed Bankes said

that "if I (Plaintiff) come outside, something was going to happen

to me."  Plaintiff did not view the threat as a racial incident.

Carroll was in a meeting with Abee and returned to the nursing home

when she learned the police were there.  Carroll suspended

Plaintiff with pay because Plaintiff was upset and hearing voices

---

[5]Plaintiff attests that during a later conversation with
Carroll about the status of her grievances, her daughter, Denise
Smith, was present with her in Carroll's office along with Shavers.
Plaintiff asked Carroll why she made the comment about her father
and the Ku Klux Klan and Carroll did not respond.  Plaintiff
attests that Smith and Shavers "observed defendant Carroll's lack
of reaction to my question." (Docket Entry No. 70, Johnson Aff. at
¶ 6.)
    The Court grants Defendant's objection to this quoted
statement and will not consider it.  Plaintiff cannot attest under
oath to what others observed; she can attest only to what she
observed.  The Court also grants in part another defense objection
to a similar statement contained in Smith's Affidavit that "Kim
Shavers and I observed defendant Carroll's lack of reaction to my
mother's question." (Docket Entry No. 71, Smith Aff. at ¶ 3.)
Smith can attest to her own observation, but not to Shavers'
observation.  Further, Smith can attest to her own impression that
Carroll did not seem very interested in investigating the
grievances Plaintiff filed, and defendant's objection to that
comment as speculation is overruled.

15

in her head. Carroll was concerned that Plaintiff might "snap" and harm the employees or her. (Carroll Depo. at 115, 120.) Bankes testified she was also suspended for the alleged threat the day Plaintiff called the police. (Docket Entry No. 51, Ex. H, Bankes Depo. at 88.) Plaintiff did not return to work and received her last pay on September 12, 2003.

While Plaintiff had been on FMLA leave between February and June 2003, Carroll had, at Abee's direction, instructed many of the employees involved in conflicts to attend appointments for interviews with Susan Powers, a licensed clinical social worker at Crossroads. Powers regularly provided employee assistance services to the nursing home pursuant to a contract with the nursing home. Abee and Carroll directed employees to meet with Powers in an effort to determine why there was so much interpersonal conflict. The counseling was informational and not disciplinary. Other employees were encouraged to attend similar interviews voluntarily. According to Abee, if an employee were mandated by her supervisor to attend a meeting with Powers and refused to go, the nursing home would take the failure to attend as a voluntary resignation.

After the September 4 suspension, Carroll directed Plaintiff to attend a mandatory appointment with Powers. Plaintiff missed the appointment and faced termination. Plaintiff, her husband, and her daughter met with Abee to explain the mis-communication that resulted in Plaintiff's failure to attend her appointment with

16

Powers. Plaintiff also reported to Abee the comments Carroll had allegedly made to her about Clarksville and the KKK. Abee discussed the matter with Carroll and they gave Plaintiff the benefit of the doubt for missing the appointment. Plaintiff agreed to attend an appointment with Powers the following day, on September 22, 2003.

Abee felt Plaintiff was confused and unable to focus during their conversation. She rambled in her discussion and did not communicate clearly. He doubted whether she would be able to function as a CNA. He agreed with Carroll's determination that Plaintiff needed to see Powers in order to be cleared to return to work.

Powers attempted to determine if Plaintiff was emotionally able to fulfill her job duties. Plaintiff appeared guarded, anxious and somewhat angry. She reported she was very frustrated with her work situation. She felt she was not being treated respectfully and was not being assisted in ways that other employees were. Plaintiff talked about family issues, some deaths she had experienced and some periods of depression. Plaintiff told Powers she was hearing voices. Powers had the impression that Plaintiff "had several life issues going on, but she was under a great deal of stress." (Docket Entry No. 51, Ex. E, Powers Depo. at 15.) Plaintiff's ability to give Powers clear, definite information was not good. Her memory was clouded. She displayed

17

a somewhat paranoid perspective on the workplace and personalized her perspective of what was happening around her in a negative way. Powers sensed Plaintiff was very overwhelmed and confused and she jumped from one idea to another. However, Powers did not react in haste to believe there was something terribly wrong because "[t]o meet someone for the first time and begin to pour out your life story is not an easy thing for some people to do." (Id.) Plaintiff reported she had an appointment the next week with a psychiatrist, and Powers encouraged her to keep the appointment. Powers did not note any suicidal or homicidal thinking. She relayed her impressions to Abee. She did not recommend Plaintiff for return to work. Powers was aware of the duties of a CNA and was concerned that Plaintiff would have difficulty assessing and intervening on behalf of residents based on her interview and the symptoms Plaintiff was experiencing. Powers did not share her observations with Plaintiff. Powers offered Plaintiff additional counseling, but Plaintiff declined it, and such counseling was not mandatory.

On September 25, 2003, Abee wrote Plaintiff a letter thanking her for following through on the appointment with Powers. He advised Plaintiff that he was continuing to consider her employment status. During September 2003, the county contracted with WorkForce Essentials to conduct communication and respect in the workplace training for all employees at the nursing home.

Plaintiff filed a second EEOC charge on September 30, 2003, claiming retaliation for filing her first EEOC charge. The EEOC issued a right-to-sue letter on February 27, 2004, finding it could not conclude that retaliation had occurred.

Based on the information from Powers and Carroll and his own experience with Plaintiff, Abee felt it was apparent that Plaintiff had significant issues and was not suitable for employment as a CNA. He decided that Plaintiff's employment should be terminated because of "a progressive chain of events or pattern of disturbing and irrational conduct." (Docket Entry No. 51, Ex. F, Abee Aff. at ¶ 17.) He considered the claimed threat and call to the police and the fact that Plaintiff could not recall what happened. He could no longer trust her judgment or her ability to interact with residents or co-workers. (Id. at 20, 25.) He did not consider Plaintiff's race or the fact that she had filed EEOC charges in making his decision. Rather, he thought Plaintiff was unusually and extraordinarily disruptive, and he was concerned for the residents, co-workers, and orderly operation of the nursing home. (Id. at ¶¶ 17, 23.)

Abee contacted Carroll by telephone and directed her to call Plaintiff in and terminate her employment in the presence of a witness. Carroll felt Abee's decision was not based on Plaintiff's race because he was sensitive to racial issues, he considered Plaintiff's claim of race discrimination to be a serious issue, he

19

expected Carroll to participate in very thorough investigation of racial complaints, and he came to the nursing home and looked at schedules, reviewed write-ups and discussed situations at length with her. Carroll agreed with Abee's decision to terminate because Plaintiff was unable to get along with her co-workers, her co-workers were very uncomfortable on the job, and they were in physical fear, as Carroll was. Plaintiff's phone call to the police "sealed it" for Carroll. (Carroll Depo. at 115.) She felt the employees were unable to function as a team and because of that, there was a good chance the residents were not going to receive care.

Carroll called Plaintiff on the telephone, but Plaintiff refused to come to the nursing home. Carroll told her she did not want to conduct the conversation on the telephone, but Plaintiff told her, in essence, "I'm not coming in so tell me what you have to tell me." (Carroll Depo. at 98.) Carroll terminated Plaintiff's employment, effective October 14, 2003, in the presence of a county HR person.

Dr. Virginia Teddy, a psychiatrist, met with Plaintiff to conduct a psychiatric evaluation on September 17, 2003, and she met with Plaintiff again on October 6, 2003. Defendants were unaware of these visits at the time they occurred. Plaintiff relayed to Dr. Teddy her lengthy history of depressive illness and indicated she was on leave from work, but she did not share with Dr. Teddy

20

any difficulties she was having at work. Plaintiff did not report the disciplinary action taken against her at the nursing home, nor did she report her complaints of race discrimination, her conduct in calling the police to the nursing home, or her filing of EEOC charges. Dr. Teddy noted Plaintiff had good grooming and hygiene, good eye contact, normal speed and volume of speech, and no psychomotor disturbance. Plaintiff's thought content gave no evidence of delusions, but was tangential. Her mood was depressed, but her insight was good and her judgment was intact. Dr. Teddy determined Plaintiff was guarded and marginally paranoid and "could be very, very suspicious of things without cause, but did not have overt bizarre delusions like one sees in schizophrenia." (Docket Entry No. 51, Ex. G, Teddy Depo. at 19.) Plaintiff continued to see Dr. Teddy through 2004, but she did not report to Dr. Teddy the termination of her employment. Plaintiff continued to be paranoid and irritable and continued to have visual and auditory hallucinations. Dr. Teddy testified Plaintiff's hallucinations would come and go and would be part of Plaintiff's life. Within a reasonable degree of medical certainty, it was Dr. Teddy's opinion that nothing that occurred at the nursing home caused Plaintiff's mental problems. (Id. at 37.) Abee, Powers, and Dr. Teddy did not

21

actually observe Plaintiff performing the duties of her job as a CNA.[6]

## II.  __STANDARD OF REVIEW__

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a

_____

[6]Defendant Montgomery County objects to paragraph 19 of Plaintiff's Affidavit in which she identifies Powers and Dr. Teddy as Caucasian.  The objection is sustained because Plaintiff has not made any claims of racial discrimination against those individuals and the race allegations are immaterial.

Case 3:04-cv-00466   Document 82   Filed 08/24/05   Page 22 of 35 PageID #: 693

genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

### III. <u>ANALYSIS</u>

Plaintiff's race claims under Title VII, § 1981, and the THRA are analyzed in the same manner and the claims may be considered together. <u>Anthony v. BTR Automotive Sealing Sys.</u>, 339 F.3d 506, 514-515 (6th Cir. 2003); <u>Wade v. Knoxville Util. Bd.</u>, 259 F.3d 452, 464 (6th Cir. 2001); <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992). To prevail on her § 1983 claim of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, Plaintiff must demonstrate that a person acting under color of state law deprived her of a federal right. See <u>Sutherland v. Michigan Dept. of Treasury</u>, 344 F.3d 603, 614 (6th Cir. 2003). Plaintiff must prove that her public employer made an adverse employment decision with a discriminatory intent and purpose. See <u>id.</u> This Court may rely on Title VII disparate treatment cases for guidance in analyzing the equal protection

23

claim.  See id.  Therefore, the equal protection claim may be considered along with Plaintiff's other theories.  Id.  County liability may attach, however, only where the execution of the government's policy or custom inflicts the injury of which Plaintiff complains.  See Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978).  Plaintiff was an at-will employee of the county.  The Court concludes, however, that Plaintiff has sufficiently shown the existence of governmental policy or custom through Carroll's provision of supervisory services pursuant to the county's contract with Interim and her close working relationship with Abee in carrying out the county's written personnel policy to satisfy a finding of government liability, if Plaintiff meets all other legal requirements to support her claims.

## A.  Race discrimination

Plaintiff has not presented any direct evidence that she was disciplined or that her employment was terminated because of defendants' intentional racial discrimination against her.  See Johnson v. University of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000).  Thus, the question arises whether Plaintiff can prove a circumstantial case of racial discrimination.  See id. The McDonnell Douglas/Burdine formula is the evidentiary framework applicable to Plaintiff's claims brought under Title VII, § 1981, § 1983 and the THRA.  See id.; Sutherland, 344 F.3d at 614.  The

24

burden to establish a prima facie case of racial discrimination is on the Plaintiff. See Johnson, 215 F.3d at 572.

To establish a prima facie case, Plaintiff must prove that (1) she is a member of a protected class; (2) she was qualified for her job and performed it satisfactorily; (3) despite her qualifications and performance, she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside the protected class. Johnson, 215 F.3d at 572-573. If the Plaintiff can establish a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their actions. Id. at 573. If the defendants carry their burden, the Plaintiff must then establish that the proffered reason was a mere pretext by showing that (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason; or (3) that the stated reason was insufficient to explain the defendants' actions. Id. A reason is not a pretext for discrimination unless Plaintiff can show both that the reason was false and discrimination was the true reason for the conduct. Id.

Plaintiff is a member of a protected class. Although the question is close, the Court gives Plaintiff the benefit of the doubt that she was qualified for her CNA position in 2003 and that she performed the duties of her job adequately.

25

Plaintiff cannot meet her prima facie burden to prove, however, that she suffered adverse employment action when she received written discipline on July 14, 2003, and when she was suspended with pay between August 5 and 12, 2003. An adverse employment action is a "'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'" <u>Mitchell v. Vanderbilt Univ.</u>, 389 F.3d 177, 182 (6th Cir. 2004) (quoting <u>Kocsis v. Multi-Care Mgt., Inc.</u>, 97 F.3d 876, 885 (6th Cir. 1996). A materially adverse change in the terms of employment generally involves termination, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities. <u>Kocsis</u>, 97 F.3d at 885-886. "The Sixth Circuit has consistently held that *de minimus* employment actions are not materially adverse and, thus, not actionable." <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 462 (6th Cir. 2000). <u>Bowman</u> relied on <u>Kocsis</u>, which held that reassignments without salary or work changes ordinarily do not constitute adverse employment decisions, and <u>Jackson v. City of Columbus</u>, 194 F.3d 737, 752 (6th Cir. 1999), which held that a police chief's suspension with pay was not an adverse employment action because the chief was not "subjected to a termination of employment, a change in salary, demotion, loss of benefits, decreased work hours, or significantly diminished

26

material responsibilities."[7]  Likewise, Plaintiff did not suffer any such materially adverse changes when she received written discipline in July 2003, and when she was suspended with pay in August 2003.

Plaintiff's termination in October 2003 qualifies as a materially adverse employment action.  The Court concludes that Plaintiff can meet each element of her *prima facie* case with regard to the termination.  Plaintiff presents evidence that she is a member of a protected class, and the Court again gives her the benefit of the doubt that she was qualified for her job and performed it satisfactorily.  Further, Plaintiff presents evidence that despite her qualifications and performance, she suffered termination, which is an adverse employment action.  As to the fourth element, Plaintiff appears to compare herself to Bankes in contending that Plaintiff was terminated but Bankes was not.  The evidence reveals Bankes and two other Caucasian CNAs who had allegedly made a racial comment about Plaintiff continued to work at the nursing home on second shift under Carroll's supervision even though Plaintiff ultimately was terminated.  Bankes and the other CNAs may not have been similarly situated to Plaintiff in all relevant respects because Plaintiff has not shown that the other

---

[7]Jackson's requirement that a complaint must include factual allegations to support each element of a *prima facie* case was abrogated in Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 n.2 (2002).

CNAs' disciplinary records were similar to Plaintiff's or that they presented the same safety concerns that Plaintiff presented. However, taking all of the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff satisfies the fourth element.

Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's termination, however. The record establishes that in the summer and fall of 2003, Plaintiff's mental condition was such that Plaintiff's supervisors and co-workers were afraid of her, and management was concerned that retaining Plaintiff as an employee would compromise resident care.

The burden thus swings back to Plaintiff to show pretext. See Johnson, 215 F.3d at 572. On this record, Plaintiff cannot show that Defendants' proffered reason for Plaintiff's termination was a mere pretext for racial discrimination. Plaintiff has not produced sufficient evidence in opposition to the summary judgment motions to show that Defendants' stated reason for her termination had no basis in fact, that the stated reason was not the actual reason for Defendants' conduct, or that the stated reason was insufficient to explain the Defendants' actions and racial discrimination was the true reason for Plaintiff's termination. See Anthony, 339 F.3d at 516; Johnson, 215 F.3d 752-753; Mitchell, 964 F.2d at 584. Cf. Kline v. Tennessee Valley Auth., 128 F.3d 337, 351-352 (6th Cir. 1997) (reversing where district court

required proof of "pretext plus," a standard rejected by Supreme Court).

Abee and Carroll personally observed Plaintiff and were concerned about her ability to function as a CNA. In light of Plaintiff's erratic behavior, including her statement about postal workers shooting people, her report of a dream in which Carroll shot and killed Plaintiff on C Hall, and her act of calling the police, Carroll referred Plaintiff to Powers to be cleared for return to work. According to Abee, another county employee who made a comment about bringing a gun to work received similar treatment because she was kept away from work until she was cleared to return. (Abee Depo. at 21-22.) Thus, contrary to Plaintiff's contention, she was not treated more harshly than an employee who behaved in a far worse manner. At the time Carroll referred Plaintiff for mandatory counseling with Powers, Plaintiff had not yet seen Dr. Teddy, and Abee and Carroll did not have the benefit of Dr. Teddy's evaluation.

Powers did not clear Carroll to return to work as a CNA. As the manager ultimately responsible for the orderly administration of the nursing home, Abee evaluated Plaintiff's record of employment, considered his own interactions with her, and consulted with Carroll, who had completed several investigations into Plaintiff's complaints. Abee made the decision to terminate Plaintiff's employment based on all of the information available to

29

him.  He denied he considered Plaintiff's race as a factor. Plaintiff has not come forward with evidence to prove that Abee's and Carroll's conduct was a mere pretext for intentional racial discrimination against Plaintiff.

In sum, Plaintiff fails to present sufficient direct or circumstantial evidence of intentional race discrimination directed toward her to survive Defendants' motions for summary judgment under Title VII, § 1981, § 1983, and the THRA.

**B.  Racial harassment**

To establish a prima facie case of a racially hostile work environment, Plaintiff must show five elements: (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition or privilege of employment; and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventative actions. Farmer v. Cleveland Public Power, 295 F.3d 593, 604 (6th Cir. 2002). Whether a work environment is hostile or abusive can be determined only by looking at all of the circumstances.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Here, Plaintiff perceived the work environment as racially hostile, but Plaintiff failed to prove that her work environment was permeated with *racial* intimidation, ridicule and insult sufficiently severe and pervasive to alter the terms and conditions

30

of her employment.  See Farmer, 295 F.3d at 605.  Plaintiff did not identify one individual, either superior or co-worker, who used racial epithets or called her by a racially derogatory name.  She did not identify any specific threats made against her that were racial in nature.  She conceded Carroll let her know that she did not believe in what the KKK stood for.  Plaintiff admits that neither of her two arguments with Bankes involved racial remarks.  Rather, Bankes told Plaintiff *she* was "mean" and "prejudiced."  Even if Bankes rolled her eyes behind Plaintiff's back and made faces, Plaintiff has not produced any evidence that Bankes acted out of racial animosity.  Plaintiff called the police to the nursing home in September 2003 to report a vague threat by Bankes that Plaintiff conceded was not racial in substance.

Plaintiff complained about a resident's family member commenting that he had been out in the sun too long.  Carroll investigated and determined that Plaintiff misunderstood the comment and it was not racial in nature.  Even if the comment was racial, the nursing home is not liable to Plaintiff for a comment made by a visitor.  Plaintiff did not suffer any work detriment as a result of the visitor's remark.

Plaintiff filed a grievance against her co-workers Powell and Clark alleging they said she should go back to the third shift "with her own kind."  Again Carroll investigated, the employees denied making the comment, and Plaintiff's account could not be

31

corroborated. Even assuming the co-worker statement was made and that it related to race, an isolated comment like this one does not establish a racially hostile work environment. See Smith v. Leggett Wire Co., 220 F.3d 752, 760 (6th Cir. 2000); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir. 1998) ("An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of . . . . discrimination.")

Carroll's investigation led her to conclude that Plaintiff was the source of any racial hostilities, not other employees, and even though Plaintiff perceived her work environment as hostile, the hostility toward Plaintiff was not based on race. All of this evidence must be considered in light of Plaintiff's concession that she experienced paranoia and suffered from visual and auditory hallucinations.

Defendants Montgomery County and Carroll took corrective and preventative action. Abee and Carroll each met with Plaintiff and her family members about Plaintiff's complaints and assured her that her concerns were taken seriously. Carroll counseled employees about race, she conducted meetings at which she instructed all employees about proper conduct on the job and grievance procedures, and she fully investigated each of Plaintiff's claims of racial harassment. The nursing home provided communication training to its employees and utilized an employee

32

assistance program to try to identify and correct the interpersonal conflict at the nursing home. See _Courtney v. Landair Transport, Inc._, 227 F.3d 559, 565 (6th Cir. 2000) (taking prompt remedial action obviates liability).

Plaintiff cannot meet her burden to overcome Defendants' summary judgment motions because she has not produced evidence that she suffered racial harassment or that racial harassment was severe and pervasive enough to be actionable. See _Oncale v. Sundowner Offshore Servs._, 523 U.S. 75, 81 (1998); _Bowman v. Shawnee State Univ._, 220 F.3d 456, 463 (6th Cir. 2000).

**C. Retaliation**

To establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in protected Title VII activity; (2) Defendants knew about her exercise of civil rights; (3) thereafter, Defendants took adverse employment action against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. _Allen v. Michigan Dept. of Corrections_, 165 F.3d 405, 412 (6th Cir. 1999). Plaintiff satisfies these elements. She filed civil rights charges twice, Defendant Carroll and Abee knew Plaintiff had filed the charges, and thereafter Plaintiff was terminated approximately two weeks after she filed the second EEOC charge. The temporal proximity between the second EEOC filing and the termination are sufficient to raise an inference that Plaintiff's protected activity was the likely

33

reason for the adverse action. See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997).

The record supports the reasonable conclusion, however, that termination occurred because of the legitimate non-retaliatory reasons proffered by Defendants. For the same reasons stated above with regard to the race discrimination claim, the Court concludes Plaintiff has not shown that Defendants' proffered reasons were a pretext for retaliation. Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 383 (6th Cir. 2002) (concluding that plaintiff failed to present sufficient direct evidence of retaliatory motive to withstand summary judgment). The amount of evidence Plaintiff must produce to establish her *prima facie* case "is not the same amount necessary to win a judgment." Avery Dennison Corp., 104 F.3d at 861. To win judgment, Plaintiff "is required to overcome the additional obstacle of the defendant's rebuttal and convincingly demonstrate the existence of discrimination." Id. Plaintiff must present a case that allows the inferences drawn in her favor at the *prima facie* stage "to be of significant force as to overcome the defendant's rebuttal or prove the rebuttal pretext." Id.

Plaintiff contends only that she filed EEOC charges and Abee knew about them before he directed Carroll to terminate Plaintiff's employment. Plaintiff has not produced sufficient evidence to convincingly demonstrate that Defendants' stated reason had no basis in fact, the stated reason was not the actual reason, or that

34

the stated reason was insufficient to explain the Defendants' actions. Thus, Plaintiff has failed to show pretext and that the real reason for her termination was retaliation for protected Title VII activity.

Because Defendants Carroll and Bankes are entitled to summary judgment in their official and individual capacities on the merits of Plaintiff's claims and because Carroll and Banks do not contend they are entitled to qualified immunity in their individual capacities, the Court does not address Plaintiff's briefing on the qualified immunity issue.

## IV. CONCLUSION

For all of the reasons stated, Defendant's Objections to Plaintiff's Response (Docket Entry No. 57) will be GRANTED IN PART AND DENIED IN PART. Montgomery County's Motion for Summary Judgment (Docket Entry No. 47) will be GRANTED. The Motion for Summary Judgment of Defendants Carroll and Bankes (Docket Entry No. 49) will be GRANTED. The case will be DISMISSED WITH PREJUDICE.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

35